MICHELLE BURROWS OSB 86160
Attorney at Law
420 SW Washington Ste. 300
Portland OR 97204
Michelle.r.burrows@gmail.com
503/241-1955
503/241-3127 fax

DIEGO CONDE, OSB 110917
Attorney At Law
385 First Street, Ste. 221
Lake Oswego OR 97034
dconde@condelawgroup.com
Tel: (971) 373-8921
Fax: (503)505-6240

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| MELISSA VAN PATTEN, Person Representative ) <br> For the Estate of Melinda Van Patten. ) <br> ) <br> ) <br> Plaintiff ) <br> ) <br> v. ) <br> ) <br> WASHINGTON COUNTY, by and through ) <br> The Washington County Sheriff's Office. ) <br> ) <br> Defendant ) | No. 3:15-cv-00891-AC <br><br> PLAINTIFF'S TRIAL BRIEF |

**INTRODUCTION**

This unfortunate case reflects the worst consequence of police indifference to the law or even their own rules. Washington County never considered the frequent and escalating abuse by Ken Van Patten as crimes; instead, they diminished his conduct blaming Melinda Van Patten for her own abuse; and, even her own death. They told her to take her keys and drive away. Not a

1 PLAINTIFF'S TRIAL BRIEF

single officer or representative of Washington County claims any responsibility for this tragedy even though they are singly tasked by law to protect victims of domestic violence. The frequent 9-1-1 calls coupled with frequent refusals to remove Ken Van Patten empowered him to continue, to escalate and ultimately validated his conduct. This is the very situation the legislature fought so hard to prohibit. "The battered woman is made to feel that the man has the prerogative to beat her. . . . She feels helpless to deal with her plight because she gets no help or protection from the police". Measure Explanation, HB2438A-Eng., House Judiciary Committee, June 17, 1977.

## FACTUAL BACKGROUND

The sheer number of domestic violence calls and resulting serious injuries, death and homelessness suffered by \ victims—mostly women—lead to the passage of the Oregon Abuse Prevention Act in 1977. ORS 133.055. The legislative history of the APA reveals the best way to reduce domestic violence injuries and death was by way of mandatory arrest. The APA is intended to protect victims of domestic violence because the seriousness and the criminality of the conduct had been so minimized that the end result was that women were told it was their responsibility not to get beaten up. Testimony, HB2438 April 6, 1977 House Committee on Judiciary.

The House Judiciary Committee felt mandatory arrest with an emphasis on a good solid investigation was critical to stop the cycle of abuse, particularly of wives. The mandatory arrest statute also includes a non-exclusive list of four factors law enforcement "shall" accomplish in their investigation. Officers are required to (1) identify the alleged assailant or "potential assailant"; (2) extent of injuries, or, (3) seriousness of threats creating a fear of physical injury;

(4) history of domestic violence between the parties; (5) any alleged crime was committed in self-defense; (6) the potential for future assaults. ORS 30.315

As further encouragement to make arrests in domestic violence investigations, police officers are afforded immunity from civil and criminal liability for arresting so long as the officer acts in "good faith and without malice". ORS 30.315(1). The officers must have probable cause to believe an assault has occurred or the assailant has placed the other in fear of imminent serious physical injury. ORS 133.055

The Washington County Sheriff's Office created the Domestic Violence Response Team (DVRT) in 2010 to more efficiently and effectively respond to domestic violence calls. DVRT tracks the number, and type of, domestic violence calls in order to provide better investigations, tracking of victims and resources. Washington County estimates a significant number of their patrol calls involve some form of domestic violence with many individuals requiring repeated visits by law enforcement.

Washington County trains officers who respond to domestic violence calls to look for specific information, including, an assault, presence of weapons, prior calls to the address, any injuries, the fear of the victim, whether the assailant has harmed animals or property. Washington County trains officers to look for signs of prior abuse, financial abuse, isolation of the victim, or control and manipulation by the abuser. Officers should do a check on prior calls to the address, talk with witnesses, and note the type of domestic violence calls from the address. Washington County trains officers about the psychology of victims including the fact they may not be financially able to leave, they may downplay the abuse and may have difficulty speaking about their abuse.

Officers are trained to be advocates for the victims. Officers are trained to look beyond the obvious.

Washington County sheriff's office responded to calls at the Van Patten address no less than three times in three months to investigate domestic violence calls made by Melinda Van Patten. Each of these calls were made through the 9-1-1 emergency dispatch system. These calls were recorded and reports were lodged by the investigating officers. Neighbors of the Van Patten's observed long standing control and abusive conduct by Mr. Van Patten toward his wife. Ken Van Patten was known to own dozens of guns and to shoot and kill dogs. In none of the previous calls did deputies actually interview any neighbor or witness to the abuse until after Melinda Van Patten was dead. The investigatory omissions are particularly troubling given the clarity of the statute and the internal policy of Washington County.

On May 26, 2013, the day before the murder, a 9-1-1 call made by a neighbor notes '*RP was talking to her neighbor Melinda and her husband was in the background and hitting her and unplugged the phone*". . In that same call Ms. Amrein told dispatch Ken Van Patten had guns and that she was *very concerned*. Washington County officers do not need to actually witness an assault. No officer spoke with the 9-1-1 caller, Mrs. Amrein, about her knowledge of the assault and the escalating nature of the abuse. No officer actually spoke with Melinda Van Patten about the assault. Officers ignored the information in the 9-1-1 call despite the fact it was sent to them via their on-board computers

On May 26, 2013 Deputies Leach, Stoneberg and Purvis responded to the Van Patten home. Stoneberg denied she did a check on previous calls to the address, but Deputy Purvis noted Stoneberg, in fact, did check on previous calls, noting "We've been here before". The information available to Stoneberg included a call on 3/16/13 in which Melinda told dispatch

Ken was loading his gun to "get her attention" and had pointed a gun at her twice before, and in one instance pointed the weapon at her and then had immediately fired to the ground. Deputy Stoneberg also had information Melinda called 9-1-1 on 4/26/13 because Ken had vandalized her car in his anger.

Deputy Purvis did not interview any neighbors or witnesses to any of the assaults but was aware of the prior charge against Mr. Van Patten and was aware Mrs. Van Patten told the officers that the next time they saw her she would be dead. This damning statement never made it into anyone's report until after Melinda Van Patten was murdered. Deputy Stoneberg minimized the statement as the rantings of an emotional woman, noting "people will say things".

Deputy Leach had almost no contact with Mrs. Van Patten but he was aware of the room of guns. The deputies denied seeing any modern weapons in the room despite photographs of the room showing numerous modern fully functional weapons. Deputy Stoneberg did not consider any of the prior 9-1-1 calls relevant to her investigation of May 26.

Deputy Stoneberg in particular treated Melinda Van Patten as if she were a hysterical woman with little credibility. Deputy Stoneberg did exactly what the legislature instructed her not to do—minimize and blame the victim. Deputy Stoneberg advised Mrs. Van Patten she was free to drive away that day—in effect telling Melinda Van Patten she had the duty to keep herself from getting killed. No officer checked on Ms. Van Patten's ability to leave. She had no money and was financially dependent on her husband. These are issues Washington County trained officers to examine and consider, and which the legislature foresaw in enacting the APA.

The officers responding to the May 26 incident violated every mandate of the APA including failing to arrest Ken Van Patten, failing to do even a cursory investigation and instead determined Mr. Van Patten was more credible than the woman who had been assaulted,

5   PLAINTIFF'S TRIAL BRIEF

threatened with a gun and almost run over with a car. These officers broke every rule governing their conduct and a woman was murdered because of it.

## ISSUES REMAINING FOR TRIAL

A. Parties. There is only one plaintiff and one defendant remaining in this case. Because this court dismissed the civil rights claims only state claims remain. The proper party on those claims is the Estate of Melinda Van Patten.

B. There is now only one defendant, Washington County. The County agreed to substitute itself for the three individual defendants.

C. There is only one claim remaining, statutory liability.

## STATUTORY LIABILITY

### a. Elements of the Claim

This is a claim brought under Oregon's Abuse Prevention Act of 1977 (APA) and its mandatory arrest provision found in ORS 133.055.

Statutory liability arises from the enactment of a statute that effectuates a legislative intent to create a right of action to enforce a statutory duty. It need not include particular elements of a negligence claim; thus, for example, if a violation is proven, it ordinarily does not matter whether the defendant acted reasonably under the circumstances. Bellikka v. Green, 306 Ore 630, 650, 762 P2d 997 (1988). Additionally, the legislature often has determined that, when a defendant's conduct violates the statute, that conduct creates a foreseeable risk to persons in the plaintiff's position, or that foreseeability is not an element of the statutory claim. Deckard v. Bunch, 358 Ore. 754, 761-762 (Or. Mar. 10, 2016), citing Gattman v. Favro, 306 Ore. 11, 15, 757 P2d 402 (1988).

To prove a claim for statutory liability, the plaintiff must establish that: (1) a statute imposed a duty on the defendant; (2) the legislature expressly or impliedly intended to create a private right of action for violation of the duty; (3) the defendant violated the duty; (4) the plaintiff is a member of the group that the legislature intended to protect by imposing the duty; and (5) the suffered an injury that the legislature intended to prevent by creating the duty. Deckard v. Bunch, 358 Ore. 754, 759-760 (Or. Mar. 10, 2016).

Oregon's Supreme Court interpreted the Abuse Prevention Act and found that it imposes a mandatory duty on officers to arrest upon probable cause; and, that it created a private right of action for a failure to do so, therefore satisfying elements (1) and (2).

> The statutes in this case, ORS 133.310(3), and its companion, ORS 133.055, are unique among statutory arrest provisions because the legislature chose mandatory arrest as the best means to reduce recurring domestic violence. They identify with precision when, to whom, and under what circumstances police protection must be afforded. The legislative purpose in requiring the police to enforce individual restraining orders clearly is to protect the named persons for whose protection the order is issued, not to protect the community at large by general law enforcement activity.
> Nearing v. Weaver, 295 Ore. 702, 712 (Or. Oct. 4, 1983)

In cases arising from a breach of the mandatory arrest provision of the APA, the risk, the harm, and the potential plaintiff were all foreseen by the lawmaker. It was not left to "the officers in this case to foresee a possible risk and to form a "reasonable" opinion as to what "due care" might be required to avoid it. Such *ad hoc* judgments are exactly what the legislature meant to overcome when it enacted the obligation to enforce judicial orders." Nearing v. Weaver, 295 Ore. 702, 708-709 (Or. Oct. 4, 1983).

The Supreme Court evaluated the intent of this law when reviewing a sister clause within the APA relating to mandatory arrest upon violation of a restraining order. The Court said:

> The widespread refusal or failure of police officers to remove persons involved in episodes of domestic violence was presented to the legislature

7   PLAINTIFF'S TRIAL BRIEF

> as the main reason for tightening the law so as to require enforcement of restraining orders by mandatory arrest and custody. Even though the arrested person is entitled to be released pending an eventual adjudication of a criminal charge or contempt, ORS 107.720(3), the temporary removal was deemed essential to emphasize the seriousness of the court's order and to permit the victims of violence to escape further immediate danger.
> <u>Nearing v. Weaver</u>, 295 Ore. 702, 709 (Or. Oct. 4, 1983

The above captioned case mirrors such legislative intent perfectly. The class of person (victims of domestic abuse), the harm (failure to arrest), and the foreseeable risk (a spouse's death) for which Plaintiff seeks redress in this claim is precisely the reason the statute was enacted. These facts satisfy elements (4) and (5) of the claim.

Given this legal backdrop this case hinges on one sole factual and legal question: Did the officers violate their mandatory duty when they did not arrest Mr. Van Patten? This is the only element left for Plaintiff to satisfy. The allegation that no probable cause for the arrest existed, conversely, the only available defense under the statute.

Oregon's probable cause standard consists of two parts: an officer must subjectively believe that a crime has been committed and this belief must be objectively reasonable in the circumstances. In determining whether the officer's probable cause belief was objectively reasonable, the court looks at the "totality of the circumstances".  <u>State v. Owens</u>, 302 Or. 196, 204 (1986).

In this particular case, the officers argue they did not have a subjective believe they had probable cause. There is harm in allowing officers to be the sole determinate of probable cause—otherwise the officer would never be wrong. The sole question remaining is whether a reasonable officer, assessing the totality of the circumstances, would have reasonably found probable cause for the arrest.  It is now up to the jury to determine whether the actions of the officers were objectively reasonable.

### b. Damages Allowed

If Plaintiff prevails, compensatory damages extend beyond physical and into psychic and emotional injuries actually caused by the failure to arrest and those damages allowed under Oregon's Tort Claim Act. *See* Nearing v. Weaver, 295 Ore. at 709; ORS 30.272. The Oregon Tort Claims act governs the upper limit of damages, which is a matter for post-trial proceedings and which caps are not to be disclosed to the jury at any time. ORS 30.269. The cap in Oregon for this case is $600,000 per claimant with a maximum cap of $1,200,000, regardless of the economic or noneconomic spread.

### c. No Defenses Grounded in Negligence are Allowed

The dissent in *Nearing* clearly stated that "[t]he majority has, for the first time, created a strict liability tort against public bodies and their police employees. Nearing v. Weaver, at 717. The majority did not disavow this claim by the dissent, rather it clarified that the liability of the officer is not liability without fault. It further stated:

> This does not mean that the obligation creates absolute liability for resulting harm. There may be various defenses, for instance that the defendant made a good faith effort to perform, or that he was prevented from doing so by one or another obstacle, either factual or legal. The officer would not be liable, for instance, for failing to make an unconstitutional arrest. Whatever would be a defense ***under the statute*** is a defense to civil liability."
> Nearing v. Weaver, 295 Ore. at 709 (Emphasis added)

In recognizing statutory liability under the APA, Oregon's Supreme Court removed these types of claim from the purview of common-law negligence; removing with it the common-law negligence defenses available to defendants (i.e. comparative fault). Only those defenses "under the statute" may be affirmative defenses to avoid civil liability. See also, *Restat 2d of Torts*, § 524 (2nd 1979) (In strict liability cases, liability is not grounded on negligence; hence, the

9    PLAINTIFF'S TRIAL BRIEF

ordinary contributory or comparative negligence of the plaintiff is not a defense to any such action).

Dated this 5th day of June 2017.

Respectfully submitted,

/s/Michelle R. Burrows
Michelle R. Burrows OSB86160
Attorney for Plaintiff